IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| Linda Pyle, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CAUSE NO: 2:12-cv-266 |
| vs. | ) |
| | ) |
| Carolyn Colvin[1], Commissioner of | ) |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

OPINION AND ORDER

This matter is before the court on the petition for judicial review of the decision of the Commissioner of Social Security filed by the claimant, Linda Pyle, on July 11, 2012. For the reasons set forth below, the decision of the Commissioner is **REMANDED**.

Background

The plaintiff, Linda Pyle, applied for Supplemental Security Income on April 27, 2009, alleging a disability onset date of November 10, 2005. (Tr. 211-213, 278) Her claim initially was denied on September 17, 2009, and again upon reconsideration. (Tr. 25, 115, 116) Pyle requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 159) A hearing before ALJ Patrick Rhoa was held on December 2, 2010, at which Pyle, Brian Simms, and Vocational Expert Richard Fisher testified. (Tr. 45-112)

---

[1]On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is automatically substituted for Michael J. Astrue as the named Defendant.

1

On December 16, 2012, the ALJ issued a decision denying benefits. (Tr. 25-35) The Appeals Council subsequently denied a request for review. (Tr. 8-10) Pyle filed her complaint with this court on July 11, 2012.

Pyle was born on September 8, 1961, and was forty-nine years old at the time the ALJ issued his decision. (Tr. 33, 51) She attended school through eighth grade and later obtained a general equivalency diploma. (Tr. 54) She had past work experience as a warehouse stocker, school bus driver, and school bus monitor. (Tr. 104) Pyle stopped working in November 2005 due to injuries she sustained in a car accident. (Tr. 61, 253)

Pyle complained of neck and back impairments, major depression, social phobia, and arm and shoulder impairments. (Tr. 211, 243) Pyle began treatment for depression and social anxiety in February 2009. (Tr. 468) She attended a partial hospitalization program and individual therapy. (Tr. 487) She discontinued the partial hospitalization program after failing to participate and expressing difficulty interacting with others in the group sessions. (Tr. 500, 507, 511, 515, 517) The medical records reveal that four months into treatment Pyle had improved in some areas and regressed in others. (Tr. 955-956)

Pyle's treatment records showed improvement in her feelings of fear, anxiety, and worry, as well as her social functioning in October 2009 and February 2010. (Tr. 951, 952) She continued to have improvement in her depression and anxiety in May 2010, and the following November, Dr. Scott A. Siegall, Pyle's treating psychiatrist, noted that Pyle had improved in her social functioning and continued to make minimal improvement in maintaining a healthy amount of sleep, eliminating or reducing suicidal ideation, learning cognitive change skills, decreasing phobic symptoms, and increasing days free of worry. (Tr. 940-941)

Over the course of the first nineteen months of Pyle's mental health treatment, Dr. Siegall assigned Pyle a global assessment of functioning (GAF) score of 40. (Tr. 482, 974, 976, 978, 980, 982, 984, 986, 988, 990, 994, 996, 998, 999, 1001, 1003, 1005, 1009, 1011, 1013, 1015, 1017, 1019, 1021, 1023) In September 2010, Dr. Siegall raised Pyle's GAF score to 50, where it remained through the date of the ALJ's decision. (Tr. 966, 968, 970, 972)

Dr. Siegall completed two assessments of Pyle's psychiatric status. (Tr. 753-759)

Dr. Siegall reported that Pyle had fair grooming and clothing, depressed mood and affect, and slow speech. (Tr. 754) She showed signs of distractibility and struggled with concentration during her mental examination. (Tr. 756) Dr. Siegall reported that Pyle experienced little improvement over her three years of treatment and would have "poor ability" to attend to a simple work routine on a constant basis. (Tr. 757) In his second assessment, Dr. Siegall stated that Pyle had poor to no ability to deal with the public, deal with work related stresses, function independently, maintain attention and concentration, understand, remember, or carry out simple instruction, behave in an emotionally stable manner, and relate predictably in social situations. (Tr. 823) Dr. Siegall stated that his opinions were supported by Pyle's depressive symptoms, including "depressed mood, suicidal thoughts, isolation, avoidance, irritability, poor memory, poor concentration, severe insomnia, anxiety, panic attacks, [and] poor coping skills". (Tr. 823)

Pyle also saw a licensed clinical social worker, Ronda Wilson-Carr, who completed an assessment of Pyle's ability to perform work-related activities. Wilson-Carr indicated that Pyle had poor to no ability to deal with the public, deal with work stresses, maintain attention or concentration, understand, remember, and carry out complex job instructions, and relate predictably in social situations. (Tr. 825-826)

Dr. Roger L. Parks, Pys.D. also evaluated Pyle's mental functioning. He reported that she appeared depressed throughout the interview with occasional tearfulness. (Tr. 731) Dr. Parks diagnosed Pyle with major depressive disorder and panic disorder with agoraphobia. (Tr. 733) He noted that Pyle's medication, Cymbalta, had not been very effective in alleviating depression. (Tr. 733) Dr. Parks assigned Pyle a GAF score of 50. (Tr. 733)

Pyle also had a history of physical impairments, including bilateral carpal tunnel syndrome. In September 2008, an EMG revealed mild bilateral carpal tunnel syndrome. (Tr. 648-649) Dr. Kanayo K. Odeluga noted positive Tinel's and Phalen's signs bilaterally in June 2009 and diagnosed Pyle with bilateral carpal tunnel syndrome. (Tr. 727) Dr. Odeluga also noted that Pyle had decreased grip strength in both hands, but he found that her fine-motor functionality was intact. (Tr. 727) Pyle had an EMG in September 2010, which revealed moderate to severe bilateral carpal tunnel syndrome. (Tr. 889) Pyle complained of symptoms of bilateral upper extremity numbness in 2009, but she continued to be assessed as having normal sensation in her extremities. (Tr. 31)

Pyle also had a neck impairment, which she reported caused pain and numbness in her hands and arms. Her cervical impairments were treated with medications and epidural steroid injections. Pyle experienced temporary relief following most injections, but her pain quickly returned to a level of seven out of ten. (Tr. 700, 785, 787, 789, 809)

At the hearing before the ALJ, Pyle and her friend, Simms, testified. Pyle stated, in relevant part, that she had a hard time using her fingers long enough to type an email, used the mouse, rather than the keyboard, to play games, used a pencil with a large eraser to dial or text from her cell phone, and that her fingers went numb when she tried to write. Pyle also reported

4

that she lived independently, could drive short distances, but with significant anxiety, and needed the assistance of a friend to go grocery shopping.

Simms testified that Pyle had difficulty using her hands for activities like buttoning clothes and that she had panic attacks three or four out of every ten times she went shopping. Pyle's son, Tim Walker, sent a letter that similarly reported that Pyle had difficulty cooking and dropped pots and pans often. Walker also wrote that Pyle only went to the store when she had to and that it would take her hours to get small amounts.

On December 16, 2010, the ALJ entered his decision denying benefits. At step one, he found that Pyle had not engaged in substantial gainful activity since March 28, 2007. (Tr. 27) At step two, he concluded that Pyle had the following severe impairments: "the late effects of right rotator cuff syndrome, bilateral carpal tunnel syndrome, osteoarthritis, degenerative disc disease of the cervical and lumbar spine, a major depressive disorder, and a panic disorder with agoraphobia". (Tr. 27) At step three, the ALJ found that Pyle did not satisfy Listing 1.00 or 14.00 because there was no evidence that she could not ambulate effectively or perform fine and gross movements. (Tr. 28) The ALJ also explained that she did not satisfy Listing 11.00 for neurological impairments because the record was devoid of evidence of disorganization of motor function of sufficient severity to meet the Listing. (Tr. 28) The ALJ also considered Pyle's mental impairments under Listings 12.04 and 12.06, but he explained that Pyle did not satisfy the Paragraph B criteria because she did not have two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace, or repeated episodes of decompensation, each of extended duration. (Tr. 28)

5

In determining Pyle's RFC, the ALJ thoroughly discussed all of Pyle's symptoms which could "reasonably be accepted as consistent with the objective medical evidence" and followed a two-step process, first determining whether there could be a medically acceptable basis for her complaints, and second evaluating the "intensity, persistence, and limiting effects of the claimant's symptoms" to determine if they limited her work ability. (Tr. 30) The ALJ first discussed Pyle's right rotator-cuff syndrome. (Tr. 30) The ALJ explained that Pyle had a full range of motion and full five out of five strength in her upper extremities at a June 2009 consultative examination. (Tr. 30) For this reason, he limited Pyle only to sedentary work that did not require overhead lifting. (Tr. 30)

The ALJ next discussed Pyle's carpal tunnel syndrome. (Tr. 31) He did not find that her allegations of numbness and diminished fine-motor functionality were consistent with the objective medical evidence. (Tr. 31) A nerve conduction study confirmed Pyle's diagnosis of bilateral mild or early carpal tunnel, but no discernable course of treatment was recorded. (Tr. 31) Pyle continued to complain of symptoms of bilateral upper extremity numbness in 2009 and at her June 2009 medical consultative examination, she was noted to have diminished grip strength, although her fine-motor functionality was intact. (Tr. 31) The ALJ acknowledged that the record indicated worsening of Pyle's carpal tunnel syndrome and that a September 2010 nerve conduction study revealed moderate to severe carpal tunnel syndrome, but he explained that the record was devoid of a discernable course of treatment, Pyle continued to have normal sensation in her extremities, and she retained fine-motor functionality to sew, operate an automobile, and utilize a computer. (Tr. 31)

The ALJ discussed Pyle's osteoarthritis and cervical and lumbar degenerative disc

6

disease before addressing her mental impairments. (Tr. 31-32) The ALJ first stated that Pyle's allegations of symptoms consistent with major depressive disorder and a panic disorder with agoraphobia were not accepted as alleged because they were not consistent with the objective medical evidence. (Tr. 32) The medical records did not reveal significant treatment for mental health prior to February 2009, except for a prescription for Cymbalta in November 2008. (Tr. 32) Pyle began regular treatment in February 2009. (Tr. 32) In April 2009, Pyle's case manager, Belinda Stepnowski, noted that Pyle's mood had improved drastically. (Tr. 32) She was also reported to be "feeling great". (Tr. 32) After notes of non-compliance with medication ceased, the medical evidence revealed that Pyle was "not bad" and only "mildly depressed". (Tr. 32) The ALJ also pointed to Pyle's daily activities as contrary to her allegations, noting that Pyle lived independently, went shopping at the grocery store, drove her car, and was able to sustain concentration throughout her July 2009 psychiatric consultative examination. (Tr. 32) Taking all of this information into consideration, the ALJ concluded that Pyle could perform simple, routine, repetitive tasks in a low-stress, stable work environment with little decision making, only occasional changes in the work setting, no contract with the general public, and only occasional contact with coworkers and supervisors. (Tr. 32)

The ALJ next discussed Pyle's GAF scores. (Tr. 33) He noted that Pyle's GAF score never rose above 50 and consistently was assessed at a level of 40. (Tr. 33) A GAF score of 40 indicates a "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood". (Tr. 33) The ALJ stated that this score was not supported by the record because Pyle lived independently, spent a lot of time with her adult son, was able to behavior appropriately in the professional-social setting of a doctor's office and commercial-

social setting of a grocery store, and attended a mass social gathering the preceding September. (Tr. 33) The ALJ determined that the GAF scores did not reflect Pyle's improvement and assigned the GAF scores little weight. (Tr. 33)

The ALJ gave no weight to the functional capacity opinions prepared by Pyle's treating psychiatrist, Dr. Siegall, and her treating social worker, Wilson-Carr, which stated that Pyle was incapable of dealing with stress, functioning independently, maintaining attention/concentration, performing simple, routine, repetitive tasks, behaving in an emotionally stable manner, and relating predictably to social situations. (Tr. 33) The ALJ stated that these limitations were not supported by or consistent with the record as a whole. (Tr. 33)

At step four, the ALJ determined that Pyle could not perform past relevant work. (Tr. 33) At step five, the ALJ found that given Pyle's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Pyle could perform, including, cutter/paster of press clippings (41,000 jobs nationally), microfilm document preparer (66,000 jobs nationally), and para-mutual ticket checker (69,000 jobs nationally). (Tr. 34)

Discussion

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. **42 U.S.C. § 405(g)** ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); ***Schmidt v. Barnhart***, 395 F.3d 737, 744 (7th Cir. 2005); ***Lopez ex rel Lopez v. Barnhart***, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." ***Richardson v. Perales***, 402

U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed.2d 852, (1972)(*quoting* **Consolidated Edison Company v. NRLB**, 305 U.S. 197, 229, 59 S. Ct. 206, 217, 83 L.Ed.2d 140 (1938)); *See also* **Jens v. Barnhart**, 347 F.3d 209, 212 (7th Cir. 2003); **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. **Roddy v. Astrue,** 705 F.3d 631, 636 (7th Cir. 2013)*; Rice v. Barnhart*, 384 F.3d 363, 368-369 (7th Cir. 2004); **Scott v. Barnhart**, 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." **Lopez**, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).** The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. **20 C.F.R. §416.920.** The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." **20 C.F.R. § 416.920(b).** If she is, the claimant is not disabled, and the evaluation process is over. If she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." **20 C.F.R. § 416.920(c).** Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. **20 C.F.R. § 401, pt. 404, subpt. P, app. 1.** If it does, then the impairment is

acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. **20 C.F.R. §416.920(e).** However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience and functional capacity to work, is capable of performing other work and that such work exists in the national economy. **42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(f).**

Pyle first argues that the ALJ erred by failing to consider the opinions of consultative psychologist Dr. Parks. The ALJ has a duty to consider all of the available evidence of the case and to explain any inconsistencies between the evidence and his conclusion. SSR 96-8p explains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled, "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

**SSR 96-8p** (footnote omitted). Thus, as explained in this section of the Ruling, there is a

10

difference between what the ALJ must contemplate and what he must articulate in his written decision. "The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a 'logical bridge' between the evidence and his conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)(quoting *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000)). A party seeking to overturn an agency's administrative decision must show that her impairment was of sufficient severity to preclude the type of work she previously performed. *McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).

Pyle argues that the ALJ erred by failing to discuss Dr. Park's report, pointing specifically to Dr. Park's notes reporting that Pyle did not have a GAF score above 50. However, the ALJ cited to Dr. Park's notes throughout his opinion and acknowledged that Pyle never was assigned a GAF score greater than 50, indicating severe symptoms. Therefore, even if the ALJ ignored Dr. Park's assessment, the GAF score Pyle points to as contradictory to the ALJ's conclusion clearly was considered. *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (explaining that where it is clear that the ALJ's decision would not be overturned by remanding the issue for further consideration, the doctrine of harmless error applies to prevent remand). Because the ALJ considered the GAF score Dr. Park assigned, Pyle, who bears the burden of proof, has failed to point to any evidence that was not considered, and consequently has not identified any error committed by the ALJ.

Although the ALJ's failure to mention Dr. Parks' report and GAF score alone may have been harmless error because the record reflects that he acknowledged that Pyle was not assigned a GAF score over 50, Pyle argues that his summary dismissal of all of her GAF scores without explanation is not. This is because the ALJ had a duty to explain his disregard of any

contradictory evidence, including GAF scores. *See* **SSR 96-9p**.

The GAF scale measures a "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision, 32, 34 (2000) (DSM IV–TR). The established procedures require a mental health professional to assess an individual's current level of symptom severity and current level of functioning and to adopt the lower of the two scores as the final score. *Id*. at 32–33. A GAF score ranging from 41–50 indicates serious symptoms; scores ranging from 51–60 indicate moderate symptoms; and scores ranging from 61–70 indicate mild symptoms. *Id*. GAF scores are "useful for planning treatment" and are measures of both the severity of symptoms and the functional level. *Id*. at 32–34. Because the "final GAF rating always reflects the worse of the two," the score does not reflect the clinician's opinion of functional capacity. "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." ***Wilkins v. Barnhart***, 69 Fed.Appx. 775, 780 (7th Cir. 2003) (citing ***Howard v. Comm'r of Soc. Sec***., 276 F.3d 235, 241 (6th Cir. 2002)).

The court does not agree that the ALJ summarily dismissed Pyle's GAF scores without explanation. The ALJ devoted a paragraph to explaining Plye's GAF scores, stating that the assessment was not supported by the record because Pyle lived independently, spent a lot of time with her son, and was able to function appropriately in the professional-social setting of a doctor's office as well as in the commercial-social setting of a grocery store. (Tr. 33) The GAF score does not necessarily reflect a claimant's ability to function, and the ALJ pointed to tasks he found inconsistent with the limitations contemplated by the low GAF scores Pyle was assigned.

The ALJ explained that the tasks Pyle was able to perform revealed a higher level of functional ability. By pointing to this contradictory evidence, the ALJ adequately explained his reason for disregarding the GAF scores. It is not the court's duty to reweigh the evidence. Rather, the court must evaluate whether the ALJ provided sufficient support, and here the ALJ provided an adequate explanation.

Pyle next complains that the ALJ erred because he did not give any weight to the opinions of her treating psychiatrist and social worker. A treating source's opinion is entitled to controlling weight if the "opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. **20 C.F.R. 404.1527(d)(2);** *See also Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007); *Gudgell v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) *(quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)); *See also* **20 C.F.R. § 404.1527(d)(2)** ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

Internal inconsistencies in a treating physician's opinion may provide a good reason to deny it controlling weight. **20 C.F.R. § 404.1527(c)(2);** *Clifford*, 227 F.3d at 871. Furthermore, controlling weight need not be given when a physician's opinions are inconsistent with his treatment notes or are contradicted by substantial evidence in the record, including the claimant's own testimony. *Schmidt,* 496 F.3d at 842 ("An ALJ thus may discount a treating physician's medical opinion if the opinion is inconsistent with the opinion of a consulting physician or when

13

the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons for crediting or rejecting evidence of disability."); *see e.g.* **Latkowski v. Barnhart**, 93 Fed. Appx. 963, 970-71 (7th Cir. 2004); **Jacoby v. Barnhart**, 93 Fed. Appx. 939, 942 (7th Cir. 2004). Ultimately, the weight accorded a treating physician's opinion must balance all the circumstances, with recognition that, while a treating physician "has spent more time with the claimant," the treating physician may also "bend over backwards to assist a patient in obtaining benefits...[and] is often not a specialist in the patient's ailments, as the other physicians who give evidence in a disability case usually are." **Hofslien v. Barnhart**, 439 F.3d 375, 377 (7th Cir. 2006)(internal citations omitted).

To begin, a licensed clinical social worker such as Wilson-Carr is not an acceptable medical source, and as such, her opinions are not entitled to controlling weight as Pyle suggests. *See*, **SSR 06-03p** ("Medical sources who are not 'acceptable medical sources,' [include, for example] licensed clinical medical workers..."). Regardless, the ALJ did not state that he rejected Dr. Siegall and Wilson-Carr's opinions in their entirety. Rather, the ALJ stated that he gave no weight to their opinions that Pyle was incapable of dealing with stress, functioning independently, maintaining attention and concentration, performing simple, routine, repetitive tasks, behaving in an emotionally stable manner, and relating predictably to social situations. He went on to explain that Pyle's mental impairments were not as extensive as she alleged because they were not supported by the record as a whole. The ALJ noted that there was no significant mental health treatment prior to February 2009, and he pointed to many medical notes indicating improvement in Pyle's condition. The ALJ stated that from late 2009 through 2010, when Pyle resumed taking her medication, the medical notes revealed that Pyle was "not bad" and only

14

"mildly depressed".  In 2009, Pyle's case manager reported that Pyle's mood had improved drastically.  The ALJ also relied on Pyle's daily activities, including living independently and engaging in activities such as shopping, driving, and sustaining concentration.  (Tr. 32)  Pyle disputes that her conditions improved and contends that the ALJ overstated her abilities.

Although Pyle argues that the record reflects symptoms of depression prior to February 2009, the ALJ was not incorrect to state that Pyle did not receive treatment for depression prior to this time.  The ALJ's statement was a correct recitation of the record.  The ALJ went on to point to other reasons that supported his opinion, including notes of improvement of her condition.  Although Pyle may be able to point to some notes that contradict the ALJ's decision, the ALJ has provided sufficient support for his conclusion, explaining that since Pyle began taking her medication regularly, the notes reflected improvement overall and show that she was meeting her treatment goals.  In fact, Pyle acknowledges that she was meeting her goals in her brief.  (Pl.'s Br. p. 15) The recent medical records reflect that Pyle's mood improved, and the ALJ did not err in relying on this evidence.  This is not a matter of the ALJ cherry-picking the evidence.

Pyle also complains that the ALJ erred by exaggerating the daily activities she performed.  Pyle argues that she only was able to drive short distances, and with significant anxiety, and that she needed the assistance of a friend to go grocery shopping.  Pyle points to both her testimony and that of Simms in addition to a note from her son.  Both lay witnesses explained that Pyle had limitations shopping.  Walker stated that Pyle only went to the store when she had to and that it would take her hours to get small amounts.  Simms reported that Pyle had panic attacks three or four out of every ten times she went shopping.  The Commissioner

15

argues that the ALJ did not need to consider this testimony because it was consistent with Pyle's own, however, even if that was true, the record does not reveal that the ALJ took these reported limitations into consideration. The ALJ made no mention of the anxiety attacks Pyle reportedly experienced while driving and shopping and has not shown either that they were unreliable or contradictory to the record. Because the ALJ relied on these activities in dismissing the opinions of Pyle's treating physicians, it is important that his decision was based on her actual abilities. The court cannot discern whether the ALJ took the limitations she alleges to have experienced while performing these activities into account, nor did the ALJ provide any explanation for disregarding this testimony. Moreover, the ALJ specifically must conclude why the testimony of a lay witness is not credible and provide a "minimal level of articulation" to support his credibility determination. *McGee v. Bowen,* 647 F.Supp. 1238, 1246 (N.D. Ill. 1986) (citing *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985)). By ignoring the testimony of the lay witnesses in its entirety and that of Pyle's reported limitations, the ALJ failed to satisfy this burden and must address this on remand.

Finally, Pyle argues that the ALJ erred in finding that she had no manipulative limitations because this determination was inconsistent with his finding that she suffered from severe bilateral carpal tunnel syndrome, he relied on exaggerated accounts of her abilities, and his reliance on the medical evidence was misplaced. Carpal tunnel syndrome "produces paresthesias in the radial-palmar aspect of the hand plus pain in the wrist, in the palm, or sometimes proximal to the compression site in the forearm. Sensory deficit in the palmar aspect of the first 3 digits and/or weakness of thumb opposition may follow." *The Merck Manual of Diagnosis and Therapy*, Fifteenth Edition, 1444 (1987). The Commissioner argues that the

16

medical evidence did not support any manipulative limitations and points to medical records where Pyle was able to button, zip, pick up coins, and had normal sensation in her extremities. It is not clear from the opinion what limitations the ALJ believed that Pyle suffered as a result of her severe carpal tunnel syndrome. Carpal tunnel syndrome affects the manipulation of the hands, yet the ALJ did not provide for any manipulation limitations or explain how the limitations he found were consistent with his finding that Pyle suffered severe carpal tunnel syndrome. The ALJ must address this direct conflict on remand.

Additionally, it is not clear that the ALJ took Pyle's testimony of her limitations into consideration. The ALJ stated that Pyle's computer use and sewing were inconsistent with a finding of manipulative limitations. However, Pyle testified that she had a hard time using her fingers long enough to type an email, used the mouse, rather than the keyboard, to play games, and used a pencil with a large eraser to dial or text from her cell phone, and that her fingers went numb when she tried to write. Simms also testified that Pyle had difficulty using her hands for activities like buttoning clothes, and Walker reported that Pyle had difficulty cooking and often dropped pots and pans. The ALJ did not acknowledge any of these reported limitations, explain why they were not reliable, or explain how they were inconsistent with the record. On remand, the ALJ must address whether Pyle has any manipulative limitations in light of her testimony and that of the lay witnesses, and, if so, what effect they have an the availability of jobs.

The medical evidence also revealed that Pyle's carpal tunnel syndrome was worsening. The tests first revealed that her carpal tunnel syndrom was mild, but later tests suggested that it was severe. The ALJ acknowledged this, but summarily dismissed Pyle's complaints without considering her testimony because there was no recorded treatment. The ALJ did not cite to any

17

evidence which contradicted her complaints nor did he explain what impact her severe carpal tunnel might have. The record also is devoid of any indication that the ALJ considered the reasons Pyle may not have pursued additional treatment. *See* **Craft v. Astrue**, 539 F.3d 668, 679 (7th Cir. 2008)(failure to comply due to inability to pay for treatment, for example, may be an acceptable reason for non-compliance). The ALJ's reliance on the lack of treatment without further inquiry was misplaced.

Finally, Pyle argues that the jobs named by the VE and adopted by the ALJ were not consistent with her RFC. Two of the positions identified required frequent reaching, and the third required constant reaching. Pyle argues that this is inconsistent with the ALJ's restriction to no overhead reaching to accommodate her cervical impairments. The ALJ is responsible for investigating and resolving any apparent conflicts between the VE's testimony and the DOT. SSR 00–49; **Weatherbee v. Astrue**, 649 F.3d 565, 570 (7th Cir. 2011). Provided there is no apparent conflict between the VE's testimony and the DOT, the ALJ may rely on the VE's confirmation that the testimony is consistent with the DOT. **Weatherbee,** 649 F.3d at 570. Under some circumstances, the ALJ is free to accept the VE's testimony when it conflicts with or exceeds the specifications provided in the DOT. *See* **Eaglebarger v. Astrue**, 2012 WL 602022 ( citing **Overman v. Astrue**, 546 F.3d 456, 464 (7th Cir.2008) ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT's authors ....")). Experience, knowledge, education, and training are all sufficient basses on which the ALJ may adopt the VE's opinion that conflicts with or exceeds the purviews of the DOT. **Eaglebarger**, 2012 WL 602022 at *8. The ALJ satisfies his duty when he questions whether the VE's answer is consistent with the

DOT and receives an affirmative answer, even if the VE's response partially is based on his experience, provided there are no apparent inconsistencies that the ALJ must further resolve.

The ALJ was permitted to rely on the VE's testimony provided there were no apparent conflicts. "A conflict is apparent if it is 'so obvious that the ALJ should have picked up on [it] without any assistance.'" ***Weatherbee v. Astrue,*** 649 F.3d 565, 570 (7th Cir. 2011) (citing ***Overman***, 546 F.3d at 463). Social Security Ruling 85-15 defines reaching as "extending the hands and arms in any direction". If the jobs identified by the VE demanded frequent reaching, this would include frequent reaching overhead according to the Social Security Ruling's definition. This clearly is inconsistent with the ALJ's limitation, and because Pyle's claim is remanded on other grounds, the ALJ is directed to reconsider this conflict on remand.

Based on the foregoing, the decision of the Commissioner is **REMANDED**.

ENTERED this 25th day of July, 2013

/s/ Andrew P. Rodovich
United States Magistrate Judge